IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs September 25, 2002

## EUGENE JOSEPH KOVALSKY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hawkins County**
**No. 7962     James E. Beckner, Judge**

---

**No. E2002-00441-CCA-R3-PC**
**March 31, 2003**

---

The petitioner appeals the denial of post-conviction relief from his conviction for voluntary manslaughter, arguing that the post-conviction court erred in finding that his guilty plea was knowing and voluntary and that he received the effective assistance of trial counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Kristi M. Davis, Knoxville, Tennessee, for the appellant, Eugene Joseph Kovalsky.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and J. Douglas Godbee and Jack T. Marecic, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On June 5, 2000, the petitioner, Eugene Joseph Kovalsky, and a codefendant, Thomas Astringer, were charged by the Hawkins County Grand Jury with first degree premeditated murder for the December 15, 1999, shooting death of the victim, Basil Dismore. On February 13, 2001, the petitioner and Astringer both pled guilty to the lesser offense of voluntary manslaughter, agreeing to be sentenced as Range III, persistent offenders to fifteen years in the Department of Correction. Thereafter, the petitioner filed a *pro se* petition for post-conviction relief on October 25, 2001, and an amended petition on November 15, 2001, alleging that he was denied the effective assistance of counsel and his guilty plea was not knowing or voluntary. Post-conviction counsel was appointed, and an evidentiary hearing was held on February 8, 2002. Among other things, the petitioner asserted in his original and amended petitions that trial counsel failed to properly investigate the

case, failed to subpoena his employment records, and failed to explain the consequences of his guilty plea, including the fact that he would be giving up his right to appeal and that he would be sentenced in a higher range than that for which his record qualified him. He further asserted that, because he did not have sufficient time to consider the plea offer and did not fully understand its consequences, his guilty plea was neither knowing nor voluntary.

Three witnesses testified at the post-conviction evidentiary hearing: the petitioner, the petitioner's trial counsel, and the attorney who represented the petitioner's codefendant. The fifty-five-year-old petitioner testified that, before moving to Tennessee, he had served from 1970 through 1990 as a police officer for the City of Yonkers, New York, during which time he had never discharged his weapon and had never been accused of using unauthorized or excessive force. He was "very aware of [the defense of] self-defense" and was confident his actions with respect to the victim qualified as self-defense.

The petitioner described the circumstances that led to the killing as follows: the petitioner; his codefendant, Thomas Astringer; and Teresa Carberry, a woman with whom the petitioner had been "cohabiting," were relaxing together at Astringer's trailer home on the evening of December 15, 1999, when the victim, who was looking for Carberry, telephoned twice, to be told each time that she wanted nothing to do with him. A short time later, the petitioner heard a knock at the door. When the petitioner opened the door, the victim stepped in without saying a word and "took a swing at [him]." The petitioner ducked the swing and pushed the victim outside, where the two began a fist fight. At some point during the fight the petitioner began to fear for his life, believing that the victim was going to kill him with his bare hands. Therefore, in an effort to slow the victim down, the petitioner pulled his .38 caliber Colt out of the holster on his belt and fired one shot at the victim, purposely aiming for the area between his stomach and vital organs. The victim initially stopped fighting after being shot but then suddenly grabbed for the petitioner's gun, managing to get his hand on the trigger. The petitioner slammed the palm of his hand against the hammer of the weapon to prevent the victim from firing, and the two began struggling for control of the gun. At that point, Astringer approached and fired two shots with his gun into the victim's head, killing him.

The petitioner retained trial counsel shortly after his arrest. He testified that trial counsel took photographs of his injuries on the day after he was hired, and initially told him that he would prove to the jury that the shooting had occurred in self-defense. That defense, however, "seemed to disappear along the line somehow." The petitioner said trial counsel did not explain to him the law on self-defense in Tennessee, or why he no longer believed it was a viable defense. Trial counsel also failed to subpoena the petitioner's former firearms officer from the Yonkers Police Department, who could have brought the petitioner's employment records to his trial. The petitioner asserted that his employment records would have shown the jury that he was not the kind of person who would commit a premeditated murder and that, had the records been available for use at his trial, he would not have pled guilty. The petitioner testified: "I would've went [sic] to trial because I would know the jury would hear, you know, about my job that I did for over 20 years, faithfully and good, excellent, because I have an excellent record."

The petitioner further complained that trial counsel relied solely on the State's investigation of the crime, rather than conducting his own investigation. He said trial counsel did not investigate the fact that the victim had committed an aggravated burglary of the petitioner's house, that he had made threatening telephone calls to Carberry's sister and mother, or that he had a criminal record. Trial counsel also failed to investigate the autopsy report of the victim or the fact that the victim's body had been moved after his death. At various points in his testimony, the petitioner appeared to suggest that he had been framed for murder or that there had been some kind of coverup in the police investigation of the crime, which counsel could have discovered had he employed more thorough investigative techniques.

The petitioner testified trial counsel did not present him with the State's plea offer until the evening before his trial was scheduled to begin, which left him with less than twelve hours to consider the offer. He accepted the plea because it was a "last minute type of offer," and he believed trial counsel's failure to have his work records subpoenaed would prove detrimental to his case if he proceeded to trial. He also thought pleading guilty would give him time to research the law on self-defense in Tennessee. The petitioner testified:

> Well, I felt that the state was looking for 53 years to life for something that I considered and I can probably prove there was self-defense. And by taking the plea, to be perfectly honest with you, at least I would be given a little room there where I could research the law to see if I did in fact break it, you know. I'm very, you know, very astute when it comes to the use of deadly physical force. But knowing it's two different states, you know, requiring something, input on something or another, I would have to research it. And there's no way that with doing 53 years to life, I'd be able to research anything.

In spite of his complaints, including his major concern regarding trial counsel's failure to have his employment records made available for trial, the petitioner testified he thought trial counsel was "a competent lawyer." Furthermore, when asked by post-conviction counsel if trial counsel had told him that his case was "hopeless and futile" and he had no choice other than to plead guilty, the petitioner replied:

> No. No, sir, not that. I felt that maybe [trial counsel] had his mind set on something. He never come to me and says, futile, you should take this. It's just -- you know, it was offered. There was a long time incarceration waiting for this. To be perfectly frank and honest, you know, I used to meet my attorney in the laundry room over at the jail. I mean, you know, you want this to be over as soon as possible, you know. I don't know if my attorney could ask for another stay, you know. You know, I don't know if he could've did

-3-

that.  I don't know how long you could take being like that and trying
to have your mind going in the right direction.  It's very hard.

Nonetheless, the petitioner asserted that his guilty plea had not been freely and voluntarily entered, testifying, "You know, this is way [sic] I say it's not within free will; it's like, back somebody up against the wall and we'll throw them a fish, you know.  I mean, see if they'll go for that, you know."  The petitioner said that at the time he entered the plea, he did not understand the Tennessee law on self-defense, the elements of voluntary manslaughter, or the consequences of his guilty plea.  He testified he had not been aware of the applicable range of punishment for first degree murder and voluntary manslaughter, had not understood the release classification percentage for his sentence, and had not realized the sentence he received was higher than that which would have ordinarily applied to him.

On cross-examination, the petitioner conceded his background as a police officer had given him experience with the court system.  He acknowledged he had provided a written statement to police stating that he had fired two or three shots at the victim and had been present when his codefendant fired one or two shots at close range into the victim's head when the victim was on the ground.  He admitted trial counsel reviewed with him the State's evidence against him, which included his own statements as well as his codefendant's statements on the 9-1-1 tape, Carberry's statement, photographs of the crime scene, and the victim's autopsy report.  He further conceded that trial counsel had been prepared to go to trial on the initial trial date and had continued to work on the case after the trial was continued.

Renfro Baird, III, the attorney who represented the  petitioner's codefendant, testified that he and the petitioner's trial counsel worked diligently to prepare for trial and would have tried the case on the original October 2000 trial date had there not been an "unfortunate situation" in which the defendants had been brought before the jury in leg irons.   They continued to work on the case after the trial was continued and, on the Thursday before the second trial date, managed to obtain the videotaped deposition of Carberry's sister, Roberta Watts, whose testimony appeared to cast doubt upon the State's time line for the murder.  They received the voluntary manslaughter offer from the State the following day, which was a Friday.  Baird testified he and trial counsel informed their clients of the offer that same day, in a joint meeting at the jail that lasted about an hour.  During that time, they went over the offer "in great detail," explaining "exactly what they were pleading guilty to and exactly what the charges were."  Both men made the decision to accept the plea that Friday, and Baird heard nothing from Friday to Monday to indicate either one had any problem with entering their pleas on Tuesday, February 13, 2001.  In his opinion, both men understood exactly what their guilty pleas entailed.

Trial counsel testified he had been practicing law for twelve years, during which time he had represented a number of criminal defendants, including some who had been charged with murder.  His initial conversations with the petitioner indicated that it was a case of self-defense, and he operated under that theory from "day one until the day of the first trial."  The petitioner had a black eye and a mark on his palm consistent with his account of the shooting, and trial counsel

immediately sent a photographer to take photographs of those injuries. Trial counsel testified he thoroughly investigated and prepared the case and was ready to go to trial on the initial October trial date. During his preparation, he reviewed over 200 pieces of evidence that had been premarked for trial; filed various motions, including motions to exclude evidence; and reviewed and discussed the autopsy report with the pathologist.

Trial counsel's continued testimony, however, revealed that although he had been prepared to go to trial on the original trial date with a defense of self-defense, there were a number of issues with which he struggled in his preparation of the case. First, the petitioner told him throughout his representation that he had shot the victim three times, consistent with his statement to police but contrary to his testimony at the post-conviction hearing. Trial counsel explained the difficulty presented for his defense by the petitioner's admitting he had shot the victim three times:

> Now, you have to remember, his testimony today was he shoots a .38 special. And if you'll recognize that at 12 0'clock position, that shell would be fired. That shell was found at the 8 0'clock position in that .38 special. What's consistent with the crime scene is that there are some steps attached to the trailer where the first -- where this incident takes place, and on the steps of that trailer, you'll find one shell casing, and in the ground within 28 to 32 inches from those steps, you'll find two more casings. So you've got three shells fired there with a .38 Brico that is consistent with his first statement, three rounds. And so I really struggled with how I was going to explain that he shoots three times. There's three shells found, just like he says, but from a different gun. And so the problem we had was that you've got another head shot, one to the cheek, one between the eyes, again with that .38 Brico. And so we've admitted shooting three times. We're going to argue about which gun we use but it's the same location where he says he shoots. And so I had real difficulty of trying to satisfy the issue of how that would take place. Again, today is the first time I've heard he shot once; I've not heard that before.

Trial counsel described two other problem areas: Ms. Carberry's potentially harmful testimony and the inconsistencies between the victim's account of the shooting and the physical evidence at the crime scene. He testified that, in one of two earlier statements, Ms. Carberry said that the petitioner had been waving his gun around before the shooting and had even pointed it at her, saying that if he could not have her, no one else would. Trial counsel explained his fear that this account would support a finding of premeditation:

> And so that being said, we had the wherewithal under her version of how this takes place for him to pull the gun, not fire it, but deliberately aim at different individuals in the room and the further

comments in terms of that deliberation. And so I really struggled with how I could put those together in light of a self-defense charge. And so, yes, I had two statements, and even went back with Ms. Carberry and tried to take another. And she started crying at that time, and she told me, Why did those S.O.B.s shoot him like they did? And so, I mean, like, Oh, my goodness. I mean, I'm looking for help, not hurt, here, you know, and so I really struggled with Ms. Carberry; no doubt about it.

Trial counsel testified, additionally, that the physical evidence at the crime scene was not entirely consistent with the petitioner's account of how the shooting transpired. The autopsy report showed that the victim had suffered some mid-body shots and that blood had run down into his left sock and shoe, all of which was consistent with the petitioner's self-defense theory. On the other hand, a photograph of the crime scene showed one of the petitioner's shoes between the legs of the victim, which, according to trial counsel, was not consistent with other portions of the petitioner's account of the shooting. Additionally, a gun[1] was found underneath the victim's body, suggesting it had been placed there after his death or that he had been sitting up with the gun on the ground behind him before being shot and falling back onto the weapon.

Trial counsel testified plea negotiations held after the first trial date resulted in an offer of second degree murder, which the petitioner instructed him to reject. Thereafter, he and Baird continued their preparations for the February 13, 2001, trial, taking Ms. Watts's deposition on Thursday, February 9. The State made the voluntary manslaughter offer the following day; he and Baird presented the offer to their clients in a joint meeting at the jail that afternoon; and the petitioner and Astringer instructed them to accept it that day. According to trial counsel's testimony, the plea and its consequences were fully explained to the petitioner not only during the approximately forty-five-minute meeting[2] at the jail, but also during one or two subsequent meetings held before the petitioner entered his plea on the following Tuesday. Trial counsel testified:

And so, and if you'll remember, the trial being scheduled on February 13th, obviously, if that were true, we'd had a room full of jurors on the 13th. We did not because, as instructed by [the petitioner] on that Friday afternoon as Mr. Baird was instructed by Mr. Astringer in my presence, we are told to accept this offer. We accept it, and the jury is called off on Friday, not 12 hours before, not Monday night before the Tuesday trial.

---

[1] Although trial counsel's testimony on this point was not altogether clear, it indicates that it was the petitioner's weapon that was found underneath the victim's hip.

[2] Jail records introduced through trial counsel's testimony show Baird and trial counsel signed into the jail at 2:30 p.m. and out at 3:15 p.m.

And so I am told Friday. Saturday goes by; I hear nothing. Sunday goes by; I hear nothing. Monday, I again meet with [the petitioner] to go over the terms of the agreement. And, in fact, Tuesday morning we came in, and I can explain later, but we meet in the jury room and go through again for the second or maybe third time the opportunities of this plea. I hear nothing during this time about him wanting not to take a plea.

. . . .

And if I may add -- I don't want to ramble; as a lawyer, I know that's not good. But let me say that [the petitioner] and I meet in this first jury room to the left as you walk through the door and again go through the terms and conditions of [the] plea, release eligibility dates and its meaning, you know, voluntary manslaughter as distinguished from first degree murder. And so we go through those things before the judge goes through what might be then a third or fourth time with [the petitioner] in open court but we did do that.

Trial counsel testified on cross-examination that the petitioner had appeared satisfied with his guilty plea, and he had not heard anything to the contrary until August or September 2001. Asked if self-defense had been discussed at the February 9 meeting at the jail, trial counsel testified that certain information the petitioner had revealed to him about a starter pistol found on the victim's body made self-defense more problematic and created ethical issues for trial counsel with respect to the petitioner's proposed trial testimony:

You know, in defense of myself, let me say that there was a planted gun in this case, and so self-defense was discussed greatly all through this case. I started getting serious doubts -- In fact, I called the Board of Professional Responsibility about a situation I found myself in with this self-defense defense, because I discovered through the testimony of [the petitioner] that a starter pistol issue came about in this case.

And so at that point as an officer of this court I cannot either lie or have someone else to do so, and so I called to get direction on how I was to proceed with this self-defense argument in light of certain evidence that may have been either generated or otherwise produced outside of what really happened. And so that being said, I was told I was to go to trial, and if I knew somebody was lying I had to report it and step out of the way. I was looking for a way out before that, just to be [quite] frank, because I didn't want this to take place in a court of law in the State of Tennessee. That being said, the

-7-

self-defense started getting a little bit thinner when that evidence came to light.

Trial counsel explained that the starter pistol had been found lying on the victim's chest with no fingerprints or blood on it. He said that the petitioner's statement to police, unlike his testimony at the evidentiary hearing, contained the claim that the victim had come to his door waving a pistol and that he had then shot him three times in self-defense. Trial counsel had not heard until that day that the petitioner had shot the victim only once or that the victim had not been waving a gun in the petitioner's face at the time. The only change in proof between the first and second trial settings was that the testimony of Roberta Watts had become available; therefore, although he could not be certain, trial counsel believed it was her deposition that caused the State to make the voluntary manslaughter offer. Knowing what he knew about the case, he felt "very lucky" with the result they had obtained.

Finally, with respect to the petitioner's complaint about trial counsel's failure to have his firearms officer brought to trial to testify about his employment record, trial counsel testified he had obtained a stipulation that the petitioner's employment record contained no charges. Thus, although the firearms officer might have provided favorable testimony, he had not deemed it necessary or worth the risk that he might be cross-examined on unfavorable aspects of the case. He explained:

> That being said, by having a witness come down here from New York, and in the unfortunate event that the planting of a gun and some of this testimony would've come to light, that would have given [the State] a chance to repetition to cross-examine that witness in terms of, well, did you know that he did this, did you know that he did that. And so with the evidence being stipulated and admitted, I don't know that the personal testimony would've really helped because I had what I needed, a positive thing. But the testimony carries with it uncertainty of a response, and that uncertainty of that response is what I was trying to avoid.

The post-conviction court dismissed the petition at the conclusion of the hearing, issuing detailed and lengthy findings of fact and conclusions of law which, upon the order of the court, were subsequently transcribed and filed as a memorandum order in the case. Among other things, the court found that trial counsel had thoroughly prepared and investigated the case and fully explained "all matters legally and factually relevant to the case to the petitioner." The court further found that the petitioner's experience in law enforcement had given him a "peculiar ability to understand the issues," and that his plea had been "voluntarily, intelligently, and understandably made in all respects." Thereafter, the petitioner filed a timely notice of appeal to this court.

## ANALYSIS

### I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

### II. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In the context of a

guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

### III. Claims of Ineffective Assistance of Counsel

The petitioner argues on appeal that trial counsel was deficient for failing to adequately prepare and investigate the case, especially by failing to secure his former firearms instructor to testify about his excellent employment record and good reputation in the community. The petitioner additionally argues trial counsel was deficient for failing to fully advise him of the defense of self-defense, and why he abandoned the theory as the case proceeded toward trial.

In its lengthy order denying the petitioner relief, the post-conviction court noted that trial counsel had often appeared before the court, had successfully represented many criminal defendants during the twelve years he had been practicing law, and had thoroughly and competently prepared and investigated the petitioner's case. After listing the numerous motions counsel had filed, the evidence he had reviewed, and the many hearings that had been held, the post-conviction court concluded as follows:

> It is obvious from the record and the evidence here today, [trial counsel] literally left no stone unturned in his representation of the petitioner, that he did everything he could possibly do, and that the representation of the petitioner was effective in every aspect. Under the guidelines of Baxter versus Rose, the petitioner received effective assistance, if not superior representation. The result achieved in behalf of the petitioner by his counsel was one that was a very successful result. As [trial counsel] put it, we are lucky to be where we are. Had the case gone to trial, it is likely that a much harsher result would have occurred and it is with certainty that this court can say that no better result would have occurred.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel provided numerous specifics regarding his preparation and investigation of the case. Both he and Baird testified that they were fully prepared to go to trial on the original October trial date when the case was unexpectedly continued on the opening morning of trial. They continued working on the case and, four days before the second trial date, obtained the deposition of the witness whose testimony both believed resulted in the State's offer of voluntary manslaughter. Furthermore, trial counsel explained that his determination not to call the petitioner's former firearms instructor was a tactical decision based on uncertainty regarding his testimony and the fact that the important aspects of the petitioner's employment history, and the lack of charges against him, had already been

stipulated.[3] With respect to this latter claim of ineffective assistance, the post-conviction court found that because self-defense became "weaker and less viable and more likely to be rejected by a jury" as the case progressed, the jury would have been more likely to have considered the petitioner's history as a police officer negatively, rather than positively. The post-conviction court found that the State's case against the petitioner was very strong, and that he could not have received a more favorable outcome than voluntary manslaughter had he proceeded to trial. Based on the evidence presented at the evidentiary hearing, we agree with the post-conviction court's assessment of the representation provided by trial counsel and of the petitioner's chances of succeeding with self-defense before a jury. The petitioner has not shown he was denied the effective assistance of trial counsel, and we, therefore, conclude that the post-conviction court properly denied relief on this claim.

## IV.  Voluntariness of Guilty Plea

The petitioner also contends that his guilty plea was not knowing or voluntary. He asserts trial counsel failed to present the plea offer until less than twelve hours before the second trial was scheduled to begin and did not explain the consequences of the plea. He argues that he did not understand the release classification percentage to which he was being sentenced or that he was receiving a sentence higher than that for which he would ordinarily qualify. He additionally asserts that he did not understand that by pleading guilty he was relinquishing his right to appeal, as evidenced by his belief that his plea of guilty would gain him time to research Tennessee law on self-defense.

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242, 89 S. Ct. at 1711. Similarly, the Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904.

Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making

---

[3]Although the petitioner asserts that his trial counsel should have presented the petitioner's former firearms instructor, as well as, apparently, other persons in the community who would have testified as to his good character, none of these witnesses were produced at the post-conviction hearing. Since we cannot speculate as to what the testimony of those witnesses would have been, the petitioner has failed to establish that he was prejudiced by their not testifying at his trial. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

this determination. <u>Blankenship</u>, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. <u>Id.</u> at 904-05.

The record in this case shows that the post-conviction court considered the appropriate factors in determining whether the petitioner's plea had been knowing, intelligent, and voluntary. In denying the petitioner relief on this claim, the post-conviction court noted the strong evidence against the petitioner and the likelihood he would have been convicted of a higher offense than voluntary manslaughter had he gone to trial. The court additionally noted the following:

> When it came time to decide whether to take a plea or not, it happened on a Friday before the trial was scheduled on Tuesday. The offer was made. [Trial counsel] immediately notified the petitioner, Mr. Kovalsky, of the plea offer to voluntary manslaughter. On that date, Friday, [the petitioner] accepted the plea offer. The plea was subsequently taken on the next Tuesday. And during all that time, there was no statement, withdrawal, or objection by [the petitioner] to the plea offer. In fact, on the plea date, he did in fact sign the statement that is now exhibit number two in which he says:
>
> "I, Eugene Joseph Kovalsky, hereby acknowledge the following facts stated herein to be true and correct, as follows, to-wit:
>
> One: I, Eugene Joseph Kovalsky, understand that I have the right to a jury trial and that no one can take that from me. I further state that I have been offered a plea of voluntary manslaughter, a Class C felony, at 15 years at 45 percent, and this reflects a move upward in the Range to get to the 15-year sentence.
>
> Two: I further acknowledge that I was indicted and would be tried for first degree murder, and that I do not have to take the aforementioned deal and plead guilty.
>
> And, three: I further acknowledge that my attorney, . . ., has informed me of all defenses and ways to defend myself at trial and that I voluntarily and knowingly plead to voluntary manslaughter."
>
> At the plea itself, the transcript of the allocution of plea of guilty covers 15 pages. This court completely and thoroughly explained to petitioner all of his rights, and he acknowledged that he

understood them. They were the same rights that his lawyer had explained to him on at least three occasions.

The fifteen pages of the transcript of the guilty plea hearing, to which the post-conviction court refers in its order denying relief, reveal that the trial court carefully, and at great length, informed the petitioner of his constitutional rights. The trial court asked if he understood that, by pleading guilty, he was waiving his right to a trial and to an appeal. The petitioner answered in the affirmative. The petitioner also answered in the affirmative when the trial court asked if he understood that he was "going to be sentenced in a range above which [he] ordinarily qualif[ied]." The court went on to explain in greater detail, and the following exchange occurred:

> THE COURT: Voluntary manslaughter is a Class C felony. If it were Range I, which is where you probably, truly, legally qualify, it's only a three to six year sentence. However, you can agree, by law, and you have agreed by law, to be sentenced up in Range III as a persistent offender, which is a range from a minimum of ten years to a maximum of fifteen years with a forty-five release eligibility date.
>
> Do you understand that?
>
> . . . .
>
> THE DEFENDANT KOVALSKY: Yes, I do, your Honor.

Before accepting the guilty pleas, the court once more repeated the sentence and release eligibility percentage to which the petitioner and his codefendant were agreeing to be sentenced, once again obtaining their assurances that they understood not only the sentence, but also that their release eligibility dates were not a guarantee that they would be released after service of forty-five percent of their fifteen-year sentence. Thus, although the petitioner claims he did not understand the consequences of his guilty plea, the record is abundantly clear that he was repeatedly informed of its consequences at great length and that he repeatedly answered that he fully understood, that he wished to plead guilty, and that he was entering his plea freely and voluntarily after having been informed of all his rights. We, therefore, conclude that the record fully supports the post-conviction court's determination that the petitioner's guilty plea was knowing and voluntary.

## CONCLUSION

We conclude that the petitioner failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel. We further conclude that the petitioner's guilty plea was knowing and voluntary. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-13-